******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CARROLL L.
BUMGARNER-RAMOS
(AC 39923)

DiPentima, C. J., and Lavine and Moll, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree, aggravated sexual
assault of a minor, risk of injury to a child and manslaughter in the first
degree in connection with the death of the three year old victim, who had
sustained numerous injuries while in the defendant's care, the defendant
appealed to this court. He claimed that there was insufficient evidence
to convict him of aggravated sexual assault of a minor and that his
conviction of both assault in the first degree and manslaughter in the
first degree violated the constitutional guarantee against double jeop-
ardy. *Held*:

1. There was sufficient evidence to support the defendant's conviction of
   aggravated sexual assault of a minor: contrary to the defendant's claim
   that the state failed to prove that he engaged in vaginal sexual intercourse
   with the victim within the meaning of the applicable statutes (§§ 53a-
   70c [a] [3] and 53a-70 [a] [2]) because there was no evidence of penetra-
   tion, the trial court credited the testimony of the associate medical
   examiner who performed the autopsy of the victim's body that the victim
   had suffered, inter alia, a small laceration that started outside the right
   labia majora and extended inside the labia majora, as well as a contusion
   inside the labia majora, and found that the defendant had caused such
   injuries, and consistent with established legal principles set forth by
   our Supreme Court, such evidence demonstrated sufficient penetration
   of the labia majora to constitute vaginal intercourse under the relevant
   statute (§ 53a-65 [2]), which provides that penetration, however slight,
   is sufficient to complete vaginal intercourse; moreover, the trial court's
   finding that the victim's injuries were inflicted by the application of
   physical force on the subject areas by the defendant was relevant to
   and necessary for its finding that the defendant was guilty of aggravated
   sexual assault of a minor, which required that the defendant used vio-
   lence to commit the offense of sexual assault in the first degree.

2. The defendant's conviction of both assault in the first degree and man-
   slaughter in the first degree violated the constitutional guarantee against
   double jeopardy, as it was undisputed that his conviction of those
   charges arose out of the same transaction and, as charged by the state,
   the assault charge was a lesser included offense of the manslaughter
   charge: the defendant could not have caused the death of the victim in
   the manner described in the operative information without first having
   caused serious physical injury to her, as the defendant was charged
   with assault in the first degree pursuant to statute (§ 53a-59 [a] [3]),
   which only required proof that the defendant, under circumstances
   evincing an extreme indifference to human life, recklessly engaged in
   conduct that created a risk of death to another person, and thereby
   caused serious physical injury to another person, and, therefore, proof
   that the defendant caused the victim serious physical injury under the
   assault charge was subsumed within the evidentiary requirement under
   the manslaughter charge that he caused the victim's death, and this
   court was not aware of any conceivable circumstance in which the
   defendant could have caused the victim's death without also having
   caused her serious physical injury; accordingly, a constitutional violation
   existed that deprived the defendant of a fair trial, and because the error
   was not harmless, the case was remanded with direction to vacate the
   conviction of the lesser included offense of assault in the first degree.

Argued October 11, 2018—officially released February 5, 2019

*Procedural History*

Substitute information charging the defendant with
the crimes of assault in the first degree, aggravated
sexual assault of a minor, risk of injury to a child and

manslaughter in the first degree, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, and tried to the court, *Swords, J.*; judgment of guilty, from which the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Erica A. Barber*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Patricia Froehlich*, former state's attorney, and *Matthew Crockett*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Carroll L. Bumgarner-Ramos, appeals from the judgment of conviction, rendered after a court trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (3), aggravated sexual assault of a minor in violation of General Statutes §§ 53a-70c (a) (3) and 53a-70 (a) (2), risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3). On appeal, the defendant claims that (1) there was insufficient evidence presented at trial to convict him of aggravated sexual assault of a minor and (2) his conviction of both assault in the first degree and manslaughter in the first degree violated the constitutional guarantee against double jeopardy. We agree with the defendant with regard to his double jeopardy claim and vacate his conviction of assault in the first degree. We affirm the judgment of the trial court in all other respects.

The following facts are relevant to the defendant's claims on appeal. The defendant met the victim's mother, Kim F.[1] (Kim), in 2009, when she was four months pregnant with N, the victim. The two began a relationship, and, following the birth of N in June, 2010, the defendant took on a paternal role until his incarceration[2] in August, 2011, at which time the couple's relationship ended. Following his release, the defendant reconciled with Kim in May, 2013, and, shortly thereafter, Kim and N began to stay periodically at the defendant's apartment in Willimantic.

On June 11, 2013, Ronald Kelly, a pediatrician, performed a routine medical examination of N, who was then three years old. During the examination, Kelly observed "some big bruises" on the child's back that Kim was unable to explain. The bruises were diagonal and similar to the shape of three fingers on a person's hand. Kelly also noted that N was acting unusual; "she was throwing herself on the ground, [and acting] totally out of control." Following the examination, Kelly, in accordance with his responsibility as a mandatory reporter,[3] informed the Department of Children and Families (department) that N had unexplained bruises.[4]

The department assigned a social worker, Rosiris Espejo, to investigate the suspected abuse. Several days after Kelly had informed the department, Espejo met with Kim at the residence of N's grandmother. During their meeting, Espejo asked Kim to name the people who were responsible for N's care. She identified herself, the grandmother, and N's daycare provider, Marion Snow. She did not mention the defendant or the fact that N had often spent time at his apartment.

On June 24, 2013, Kim brought N to the grandmother's house. When the grandmother saw N that day, she noticed that N had "black and blue" bruises around her

eyes. Kim told her that the bruises were caused by a fall.[5] Later that day, when the grandmother attempted to change N's diaper and to give her a bath, N started screaming and jumped into her grandmother's arms. N had never acted this way before and seemed scared, as though "something came to her mind."

Two days later, on June 26, 2013, Kim and N stayed at the defendant's apartment. The defendant had rented a room in the basement of a three-story house that was occupied by several other individuals. When Kim and N stayed at the apartment, Kim slept with the defendant on a mattress on the floor, and N slept on a smaller mattress beside them. That evening, Kim began to pack some of her belongings, intending to leave with N and to go to the grandmother's house. The defendant became angry, yelled at Kim and, in an effort to prevent her from leaving, took her cell phone and car keys. The defendant then went into the living room, just outside the bedroom, and stayed there for most of the night while Kim and N remained in the bedroom. At around midnight, the defendant came back into the bedroom to sleep.

In the early morning hours of June 27, 2013, N started "fussing and crying and wouldn't settle down." The defendant got out of bed, went over to where N was sleeping, and repeatedly and forcefully poked her in the stomach. While he was poking her, he yelled at her: "This is what you do to me. You're going to keep me up? How do you like it?" After he poked her several times, N started to cry. Kim picked her up and eventually comforted her back to sleep.

Later that morning, the defendant left to attend a therapy program at Natchaug Hospital. A short while later, Kim and N woke up. N did not seem to be in any apparent distress, and she ate her breakfast without difficulty. Kim received a phone call from the defendant asking her to come get him at Natchaug Hospital because he felt sick and his therapist told him to go home. After she picked him up and dropped him off at the apartment, Kim went to the grandmother's house to get some medicine. When she got back to the apartment, she took a bath with N, during which she noticed bruising on the child's chest in the area where the defendant had poked her. At approximately 12:30 p.m., Kim left for work, leaving N alone with the defendant.

While she was at work, Kim and the defendant exchanged several text messages. At 1:42 p.m., the defendant sent the following message: "So far so good just brushed her hair her bump is still a little swollen but it should be gone soon!"[6] Then, six minutes later, he texted: "Hopefully her bump leaves soon! She's behaving really well!!!" At 1:52 p.m., Kim responded to the second message: "Where is it?" Five minutes later, the defendant answered: "I feel shitty I can't breathe. The same swollen side that [N] had. I noticed it when

I brushed her hair, she's doing good tho[ugh]!!!"

At 2:21 p.m., Kim texted the defendant: "You want me to come get [N]?" He responded immediately: "She's good! She's chilling, keeping me company." After he had asked Kim when she would be home, the defendant, at 2:31 p.m., texted: "She is feisty!!!!" Then, six minutes later, the defendant wrote: "Should I give her medicine? She worries me because that bump takes so long to go away. It's like another came or something and the bruising too! She should be ok!" At 2:40 p.m., the defendant texted: "She feels [warm] ma!" Kim responded at 2:41 p.m., with two separate messages: "The heater is on remember, [because you're] sick," followed by: "So that is prob[ably] why she feels warm." Approximately ten minutes later, the defendant wrote: "Her head still looks swollen should I put ice [on it]?" Kim responded: "Yes." The defendant then, at 2:52 p.m., texted: "And her eye is like a [little] swollen too. But she won't let me!" He then sent a text at 3:05 p.m., which read: "I'm putting ice [on it] now!" Approximately twenty minutes later, the defendant wrote: "Put [N] in the [tub] to cool her off she's having fun!"

The defendant sent Kim a text at 4:05 p.m., in which he wrote: "[N] and I just puked." One minute later, Kim responded: "You both puked? Omg." Then, at 4:10 p.m., Kim asked: "Did you make it to the bathroom at least?" At 4:11 p.m., the defendant replied: "[N's] left eye is strai[ght] but the [right] eye [is] still a [little] swollen, another couple of days [and] she'll be good!!!" Approximately ten minutes later, Kim asked: "Is she okay? Did she puke a lot?" Immediately, the defendant answered: "[A little] bit."

At 5:34 p.m., the defendant texted: "Ok, I think [N] is getting better because her eye is all swollen!" Then, five minutes later, he wrote: "[N] and I took [a] hot bath!!!" Approximately an hour later, the defendant sent the following text: "Kim, I can't take it. I'm in fucking pain!!!!!" Kim responded four minutes later: "Let's go to the hospital. [I'll] drop [N] off at my mom's." The defendant wrote back immediately: "Give it a [little] more. It's [my] fucking throat." At 7:45 p.m., the defendant texted: "[Damn], I can't even eat my throat hurt[s] that much!!!!!" Four minutes later, Kim responded: "I don't want you to stop breathing I'm worried."

Approximately an hour later, the defendant wrote: "[N] threw up again!!!!! All over the bed!!!" Then, a few minutes later, he texted: "She's pale I'm pale!!!! Wtf." Twenty minutes later, at 9 p.m., he wrote: "Hurry." One minute later, Kim responded: "I think we need to go to the emergency room." Immediately, the defendant replied: "[N] has too many bruises." Later, at 9:23 p.m., the defendant wrote: "She's eating oranges [a]nd talking." Four minutes later, he texted: "Now that I think about it that sh[it] look[s] like Lyme [disease]!"

Sometime after 9 p.m., Kim arrived back at the defendant's apartment. The defendant met her at the top of the stairs leading to the basement and gave her money to buy Tylenol for N. At this time, Kim did not go downstairs to check on N. She drove to a local pharmacy, purchased Tylenol, and drove back to the apartment. When she arrived back, she went downstairs and found N lying on the defendant's mattress in the bedroom. N was "badly bruised from head to toe," and the mattress was covered in vomit. Kim noticed that N was wearing a different outfit than the one she had dressed her in before she left for work. Concerned that there might be more injuries in addition to the ones she could see, Kim undressed N and found a large mark on her stomach. To Kim, it appeared as though something had bitten N. She observed bruises and scratches on her feet and "marks all over her body," and her head was swollen and bruised on the right side.[7] Kim testified that N felt cold and clammy, and that she noticed that the child was having trouble breathing.

Kim dressed N in fresh clothes and carried her outside to the car to go to the hospital. As she put her in the car, Kim realized that N had stopped breathing. Kim took her out of the car and ran to the sidewalk in front of the apartment. She put N on the ground and attempted to perform cardiopulmonary resuscitation (CPR) but stopped when she started to panic. Kim screamed for help, and, hearing her cries, one of the defendant's roommates, Robert Trevorrow, came outside to assist her. Trevorrow resumed CPR while Kim dialed 911 and requested an ambulance. At some point, the defendant joined Kim and Trevorrow outside on the sidewalk and attempted to assist in the efforts to resuscitate N. When the ambulance arrived, Kim handed N to the responding emergency personnel and joined them in the back of the ambulance. The defendant, at some point, also entered the rear of the ambulance; however, he was told to ride up front with the driver in order to give more space to the treating technicians.

Christopher Reddy, a paramedic, arrived on scene at 10:23 p.m., shortly after the ambulance. He entered the back of the ambulance and observed that N had no pulse and was not breathing and that emergency personnel had started to perform CPR. He also noticed that N had bruises all over her body, including bruising and swelling in the area around her right eye, and that her abdomen appeared "distended" and "rigid," which was unusual for a three year old child. After being on scene for approximately two minutes, the ambulance left for Windham Hospital and arrived there approximately three minutes later.

At Windham Hospital, N was transferred to the care of Max Goldstein, a physician working in the emergency department that evening. Goldstein observed that N had sustained numerous injuries. He testified that bruises

were scattered diffusely throughout her body; she had what appeared to be bite marks on her skin; there was trauma to her vaginal, perineal, and anal areas, and "the vagina itself had trauma"; and there was extensive swelling behind her face. Goldstein and medical personnel continued resuscitation efforts but ultimately were unsuccessful in reviving N, who was pronounced dead at 11:15 p.m.[8]

Notified of N's death, state police detectives from the eastern district major crimes squad arrived at the hospital and interviewed Kim and the defendant separately. During the interview, the defendant claimed that N had been sick for a couple of days and that she had been vomiting periodically during this time. When asked about the bruises to N's face and body, he said that she had rolled off her mattress and hit her head on a baseboard heater several days earlier, and that she had caused the other bruises to herself during a temper tantrum. With regard to the specific events that took place on June 27, 2013, the defendant stated that N was not acting herself, "she was out of it," and she was throwing up all day and crying a lot. He stated that he gave her a bath at around 6 p.m., dressed her in new clothes, and then watched a movie with her. Throughout the interview, the defendant repeatedly denied hitting or abusing N in any manner.

In the early morning hours of June 28, 2013, the defendant was arrested in connection with N's death and transported to Troop K in Colchester. After he read and waived his *Miranda*[9] rights, the defendant agreed to an interview with detectives. During this interview, the defendant expressed suicidal feelings and invoked his right to counsel. The detectives stopped questioning him and told him that if he wanted to speak with them again, he would have to initiate the conversation. A short while later, the defendant requested to speak with the detectives, and he again read and waived his *Miranda* rights. The defendant claimed, during this second interview, that he was playing with N, swinging her around by her arms, and that she hit her head on a metal pole in the middle of the bedroom. Although he initially denied hitting her, after further questioning, he admitted that he spanked her because she would not stop crying. When asked about the injuries to N's vaginal, perineal, and anal areas, he said he was "spanking the shit out of her there . . . on her ass," "slapping [her] ass" and that he "might" have hit her in the vaginal, perineal, and anal areas. He also told the detectives that "she was kicking and moving and that he was just spanking away." When detectives inquired about the bite marks all over N's body, he replied: "I think I overdid it with the biting."

Following his arrest, the defendant was charged by long form information with assault in the first degree in violation of § 53a-59 (a) (3), aggravated sexual assault

of a minor in violation of §§ 53a-70c (a) (3) and 53a-70 (a) (2), risk of injury to a child in violation of § 53-21 (a) (1), and manslaughter in the first degree in violation of § 53a-55 (a) (3). The defendant waived his right to a jury trial. After an eight day trial, the court found the defendant guilty on all counts and sentenced him to a total effective term of thirty years of incarceration, followed by fifteen years of special parole.[10] From this judgment the defendant now appeals. Additional facts will be set forth as necessary.

## I

The defendant first claims that the evidence presented at trial was insufficient to convict him of aggravated sexual assault of a minor.[11] Specifically, the defendant argues that the state failed to prove that he engaged in sexual intercourse with N, within the meaning of §§ 53a-70c (a) (3) and 53a-70 (a) (2), because there was no evidence of penetration. We disagree.

The following facts are relevant to our resolution of this claim. During the defendant's second interview at Troop K, detectives asked him to explain the injuries to N's vaginal and anal regions. The defendant responded that he "was spanking the shit out of her . . . ass" and that he "might have hit her right there." When asked if he spanked N "in the front too," the defendant said: "[S]he was kicking and moving, and [he] was just spanking away." When asked to admit whether he sexually assaulted the child, the defendant replied: "I didn't sexually assault her. I spanked her there. I don't know if that's the same thing, [or] if you guys are going to classify it as that." Finally, the defendant denied that any of his semen would be found on the child.[12]

At trial, Susan Williams, an associate medical examiner with the Office of the Chief Medical Examiner, testified that on June 28, 2013, she had performed an autopsy of N's body. During her examination, Williams observed injuries to N's vaginal, perineal, and anal areas. With respect to the injuries to N's vagina, Williams noted bruising and a "small laceration" to the labia majora and a contusion to the soft tissue "on the inner portion of the labia majora." Williams opined that these injuries were the result of blunt force trauma. Additionally, Williams testified that she performed an internal examination of N's rectum, in which she found that the pelvic soft tissue was hemorrhagic. In Williams' opinion, because this area is protected by the pelvic ring, the only way that it could be injured is with "something being up there adjacent to it," i.e., the insertion of some object into the vagina or rectum. When asked whether these injuries were consistent with a child being spanked, Williams testified: "I wouldn't expect spanking to cause the deep tissue and soft tissue, fat, muscle hemorrhage that I saw. I [examined] the section in the rectum which is above the anus. I would not

expect that to have bled way up there."

In providing the evidentiary basis for its conclusion that the defendant engaged in sexual intercourse as defined by §§ 53a-70c (a) (3) and 53a-70 (a) (2), the court stated the following: "The court thus finds that the defendant was the person who inflicted the injuries and contusions to [N's] inner thighs, the area over her pubic bone, and the outside and inside of the labia majora, and that those injuries were inflicted by the application of physical force on those areas by the defendant. The court further finds, however, that there is insufficient evidence to conclude that the defendant caused the hemorrhaging of the deep tissue between the anus and the vagina.

"At the time of her death, [N] was three years old. As stated before, the defendant is an adult male well in excess of two years older than the victim. The court concludes therefore that the state has proven beyond a reasonable doubt that the defendant engaged in vaginal intercourse as defined in our statutes and our case law with [N], a person not married to him; that at the time of the act, [N] was less than thirteen years of age and that the defendant was more than two years older than her. Furthermore, the court finds that the defendant used violence to commit the sexual intercourse."

On appeal, the defendant argues that the court's evidentiary basis for concluding that he engaged in vaginal sexual intercourse with N is insufficient. We do not agree.

We begin by setting forth the applicable standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Hector M.*, 148 Conn. App. 378, 384, 85 A.3d 1188, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014).

"While the [trier of fact] must find every element proven beyond a reasonable doubt in order to find the

defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [trier of fact] to conclude that a basic fact or an inferred fact is true, the [trier] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [trier] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 489–90, 698 A.2d 898 (1997).

For the purposes of §§ 53a-70c (a) (3) and 53a-70 (a) (2), sexual intercourse is defined as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. *Penetration, however slight, is sufficient to complete vaginal intercourse*, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body." (Emphasis added.) General Statutes § 53a-65 (2). Our Supreme Court in *State* v. *Albert*, 252 Conn. 795, 809, 750 A.2d 1037 (2000), recognized that "there is nothing to suggest that the term genital opening was intended to require that penetration occur beyond the labia majora to at least the labia minora . . . ." *State* v. *Hector M.*, supra, 148 Conn. App. 386.

"Under common usage of the language, the term genital opening means an opening associated with the genitals. The word genitals means genitalia . . . which means the organs of the reproductive system; [especially]: the external genital organs. . . . Similarly, Taber's Cyclopedic Medical Dictionary defines genitals and genitalia as organs of generation; reproductive organs, and states that the female external genitalia collectively are termed the vulva or pudendum and include the . . . labia majora and that the internal genitalia are the two ovaries, fallopian tubes, uterus, and vagina. . . . Thus, as the term genitals refers especially

to the external genital organs, which include the labia majora, it would be unreasonable to conclude that when the legislature used the term genital opening, it meant to exclude the external genital organs and refer only to the internal genital organs such as the vagina.

"Opening is defined in common usage as something that is open . . . . Open, in turn, is defined as spread out: unfolded: having the parts or surfaces laid back in an expanded position: not drawn together, folded, or contracted . . . . We previously noted that the labia majora are defined as the outer fatty folds bounding the vulva. . . .

"From these definitions, it can be deduced that: (1) the term genitals commonly refers to the external reproductive organs, which include, on a female, the labia majora; (2) the term opening means something that is unfolded or spread out; and (3) the labia majora are folds. Thus, we conclude that the opening between the folds, i.e., labia majora, is the genital opening and that the labia majora form the boundaries of the genital opening. Moreover, because we have construed the term vaginal intercourse, as that term is used in § 53a-65 (2), to include digital penetration, however slight, of the genital opening . . . we conclude that digital penetration, however slight, of the labia majora is sufficient penetration to constitute vaginal intercourse under § 53a-65 (2)." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Albert*, supra, 252 Conn. 807–809.

In *Albert*, our Supreme Court determined that the evidence was sufficient to convict a defendant of sexual assault in the first degree on the basis of the victim's testimony that the defendant "touched '[i]nside' her crotch," and two scrapes that were observed on the victim's labia majora, which a pediatrician testified were consistent with penetration of the genital opening. Id., 813–14. In rejecting the defendant's argument that there was no evidence to infer that the defendant "did anything other than touch the surface of [the victim's] labia majora," the court concluded that a reasonable jury could infer from the evidence that "the defendant's finger entered the victim with some force and passed beyond the actual location of the scrapes on the victim's labia major." (Internal quotation marks omitted.) Id., 814. Applying the language of § 53a-65 (2) and *Albert*'s judicial gloss, this court has upheld sexual assault convictions predicated on similar circumstantial proof of penetration. See, e.g., *State* v. *Gerald A.*, 183 Conn. App. 82, 94, 191 A.3d 1003 ("jury was free to infer, on the basis of this record and its common sense, that if [the victim] flinched and clenched because [i]t hurt when the defendant tried to put his finger inside of her vagina, that the defendant digitally penetrated, at the very least, [the victim's] labia majora." [internal quotation marks omitted]), cert. denied, 330 Conn. 914, 193 A.3d 1210

(2018); *State* v. *Elmer G.*, 176 Conn. App. 343, 354, 170 A.3d 749 (concluding that jury could infer that when defendant forced victim to put her "mouth on his penis," that defendant did so "in a manner that caused his penis to enter into her mouth"), cert. granted on other grounds, 327 Conn. 971, 173 A.3d 952 (2017); *State* v. *Edwin M.*, 124 Conn. App. 707, 725–26 and n.7, 6 A.3d 124 (2010) (evidence that anal injury consistent with penile penetration sufficient for the purposes of affirming sexual assault conviction), cert. denied, 299 Conn. 922, 11 A.3d 151 (2011).

Here, the defendant contends that the application of physical force on N's vagina and labia majora was insufficient to support a conviction of sexual assault because there was no evidence that he penetrated N's genital opening. This argument, however, misapprehends the evidence, the court's explication of its verdict, and the controlling principles discussed previously. Most significantly, the court credited the testimony of Williams that N had suffered, inter alia, a small laceration that started outside the right labia majora and extended inside the labia majora, as well as a contusion inside the labia majora, and found that the defendant had caused such injuries. Consistent with the principles set forth in *State* v. *Albert*, supra, 252 Conn. 809, such evidence demonstrates sufficient penetration of the labia majora to constitute vaginal intercourse under § 53a-65 (2). See id., 812 ("slight penetration does not require vaginal penetration"); see also id., 813 ("we disagree with the defendant's suggestion that a defendant must put his finger or his fingers 'beyond the labia majora' for his conduct to fall within the definition of sexual intercourse in § 53a-65 [2]"). With regard to the defendant's challenge to the court's statement that "those injuries were inflicted by the application of physical force on those areas by the defendant," the defendant effectively ignores that such finding was relevant to and necessary for the court's finding that the defendant was guilty of *aggravated* sexual assault of a minor pursuant to § 53a-70c (a) (3), namely, that the defendant "used *violence* to commit [the] offense" of sexual assault in violation of § 53a-70 (a) (2). The court had explained previously that because "violence" is not a defined term for purposes of § 53a-70c (a) (3), it was using a dictionary definition, i.e., "exertion of physical force so as to injure or abuse." On the basis of the foregoing, we conclude that there was sufficient evidence to support the defendant's conviction of aggravated sexual assault of a minor.

Accordingly, construing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that there was sufficient evidence from which the court reasonably could have found beyond a reasonable doubt that the defendant was guilty of aggravated sexual assault of a minor.

## II

Next, the defendant claims on appeal that his conviction of both assault in the first degree and manslaughter in the first degree violates the constitutional guarantee against double jeopardy. Specifically, the defendant argues that his conviction of those charges arises out of the same transaction and that the assault charge is a lesser included offense of the manslaughter charge. Accordingly, the defendant submits that, under a *Blockburger*[13] analysis, his conviction of assault in the first degree should be vacated. We agree.

As a threshold matter we must determine whether this claim was preserved for review. The defendant argues that because it was raised prior to sentencing, the claim was preserved. We agree with the state, however, that the claim was not preserved because it was not raised distinctly at trial. See *State* v. *Smith*, 100 Conn. App. 313, 320 n.6, 917 A.2d 1017 ("[a] party cannot preserve grounds for reversing a trial court decision by raising them for the first time in a postverdict motion" [internal quotation marks omitted]), cert. denied, 282 Conn. 920, 925 A.2d 1102 (2007). Irrespective of the fact that the claim was unpreserved, it is still reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 688–89, 127 A.3d 147 (2015). Because the record is adequate for our review, and the defendant's claim that his conviction violated his right against being placed in double jeopardy is of constitutional magnitude, our inquiry focuses on whether the violation alleged by the defendant exists and deprived him of a fair trial. See id., 689.

The following additional facts and procedural history are relevant to our analysis of this issue. The defendant was charged by long form information with, inter alia, one count of assault in the first degree and one count of manslaughter in the first degree. With respect to the assault charge, the state alleged: "[O]n or about June 27, 2013 . . . [the defendant] acting under circumstances evincing an extreme indifference to human life, did recklessly engage in conduct which created a risk of death to another person, to wit: [N] . . . and did thereby cause serious physical injury to [N] . . . ."[14] As to the charge of manslaughter in the first degree,

the state alleged: "[O]n or about June 27, 2013 . . . [the defendant] under circumstances evincing an extreme indifference to human life, did recklessly engage in conduct which created a grave risk of death to another person, to wit: [N] . . . and did thereby cause the death of [N] . . . ."[15] At sentencing, the trial court, sua sponte, questioned whether the defendant could be convicted of both manslaughter in the first degree and assault in the first degree.

"The Court: It would seem to the court that the assault conviction on the first count is a lesser included offense of the manslaughter conviction on the fourth count. . . .

"[The Prosecutor]: Your Honor, the state's position with respect to the assault and the manslaughter [convictions] . . . is that they are two separate offenses. . . .

"[O]ur position is that the defendant is to be sentenced separately on the assault in the first degree and the manslaughter because we have the head injury which is separate from the forceful poking which caused the injuries to the bowel and the mesentery which are the cause of death. But we have the trauma to both sides of the head and the 100 milliliters of blood pooling in the child's skull cavity, as opposed to the 300 milliliters of blood pooling in her abdominal cavity. So it's our position that we have a separate incident and, therefore, separate sentencing. . . .

"The Court: All right. Well, I'm convinced by the state's argument that the assault in the first degree— more specifically, the head injury—did not contribute to the cause for death and so that may be a valid consideration. Accordingly, the court will not vacate the conviction on the assault in the first degree."

In concluding, however, that the defendant's conviction of assault in the first degree and manslaughter in the first degree arose from separate transactions, the court failed to consider that the state, during closing argument, relied on the injuries to N's abdomen to support its position that the defendant was guilty of both counts.[16] In its appellate brief, the state concedes that, in light of its closing argument, the assault conviction and manslaughter conviction did arise out of the same transaction.[17] Nonetheless, the state contends that we should still affirm the defendant's conviction of assault in the first degree because it is not a lesser included offense of the manslaughter conviction. In response, the defendant argues that one cannot commit manslaughter, as it is charged in this case, without also committing an assault and, therefore, the conviction for assault in the first degree violates his constitutional right against double jeopardy.

Before addressing this claim, we note that "[o]ur standard of review for analyzing constitutional claims such

as double jeopardy violations prohibited by the fifth amendment to the United States constitution presents an issue of constitutional and statutory interpretation over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Arokium*, 143 Conn. App. 419, 434, 71 A.3d 569, cert. denied, 310 Conn. 904, 75 A.3d 31 (2013). "The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. . . . Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of [the Connecticut constitution] include protection against double jeopardy. . . . We have further recognized that the [d]ouble [j]eopardy [c]lause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Internal quotation marks omitted.) *State* v. *Underwood*, 142 Conn. App. 666, 681, 64 A.3d 1274, cert. denied, 310 Conn. 927, 78 A.3d 146 (2013).

"Double jeopardy analysis in the context of a single trial is a [two step] process, and, to succeed, the defendant must satisfy both steps. . . . First, the charges must arise out of the same act or transaction [step one]. Second, it must be determined whether the charged crimes are the same offense [step two]. Multiple punishments are forbidden only if both conditions are met. . . . At step two, we [t]raditionally . . . have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Porter*, 328 Conn. 648, 655, 182 A.3d 625 (2018). "The test used to determine whether one crime is a lesser offense included within another crime is whether it is not possible to commit the greater offense, in the manner described in the information . . . without having first committed the lesser . . . . This . . . test is satisfied if the lesser offense does not require any element which is not needed to commit the greater offense. . . . Therefore, a lesser included offense of a greater offense exists if a finding of guilt of the greater offense necessarily involves a finding of guilt of the lesser offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Carlos P.*, 171 Conn. App. 530, 538, 157 A.3d 723, cert. denied, 325 Conn. 912, 158 A.3d

321 (2017).

"When conducting the first inquiry, however, it is not uncommon that we look to the evidence at trial and to the state's theory of the case." *State* v. *Schovanec*, 326 Conn. 310, 327, 163 A.3d 581 (2017). The second step of the *Blockburger* test, however, "is a technical one and examines only the statutes, charging documents, and bill of particulars as opposed to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Mark*, 170 Conn. App. 254, 267, 154 A.3d 572, cert. denied, 324 Conn. 926, 155 A.3d 1269 (2017). As we have already acknowledged, the state concedes that the defendant's conviction of the charges at issue arises from the same transaction. We limit our inquiry, therefore, to the second step in the analysis: Whether assault in the first degree, as charged, is a lesser included offense of manslaughter in the first degree, and, thus, the two crimes constitute the same offense under *Blockburger*.

The defendant argues that his conviction of assault in the first degree and manslaughter in the first degree constitutes the same offense because one cannot commit manslaughter without also committing assault in the first degree as it was charged in this case. In asserting his claim, the defendant acknowledges that there is an obvious difference with respect to the result element for both crimes. Specifically, to be convicted of manslaughter, the state must show that the defendant caused the death of another person, whereas a conviction of assault in the first degree only requires proof of serious physical injury.[18] Nevertheless, the defendant submits that one cannot cause the death of another in the manner described in the information, without first causing serious physical injury to that person. We agree.

The state argues that this case is controlled by *State* v. *Alvarez*, 257 Conn. 782, 783, 778 A.2d 938 (2001), in which our Supreme Court affirmed a defendant's conviction of both manslaughter and assault in the first degree arising from the same transaction. Upon review, however, we believe that *Alvarez* is inapposite. Although the defendant in *Alvarez* was charged with both manslaughter in the first degree and assault in the first degree, he was charged with assault under § 53a-59 (a) (1) and (4). Pursuant to this charge, the state was required to prove that "the defendant with intent to cause serious physical injury to [the victim] *while aided by two or more persons actually present did cause serious physical injury* [*to the victim*] . . . *by means of a dangerous instrument* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 790. Here, the defendant was charged with assault in the first degree under subsection (a) (3), which only requires proof that the defendant "under circumstances evincing an extreme indifference to human life . . . recklessly

engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." As the defendant in this case correctly contends, proof that he caused the victim serious physical injury is subsumed within the evidentiary requirement, under the manslaughter charge, that he caused the victim's death. Unlike *Alvarez*, the state was not required to prove an additional element, e.g., the assistance of two or more persons or the use of a dangerous instrument, to convict the defendant of assault in the first degree.

Additionally, the state argues that the defendant's double jeopardy claim fails because there is no legal requirement that a defendant actually inflict serious physical injury in order to be held criminally liable for causing the death of another. We believe that this assertion conflates the principle that one can be responsible for a person's death without physically striking the victim; see, e.g., *State* v. *Spates*, 176 Conn. 227, 232, 405 A.2d 656 (1978) (finding trial court did not err when it instructed that jury "could convict the defendant of manslaughter if [it] found that the defendant inflicted emotional injury, stress or trauma which proximately caused [victim's] death" [internal quotation marks omitted]); with the present issue of whether one can cause another's death without also causing that person serious physical injury. Considering the theoretical possibilities in this case, and not the evidence, as we are required to do in the second step of the *Blockburger* analysis, we are aware of no conceivable circumstance in which the defendant could have caused N's death without also having caused her serious physical injury as it is defined under § 53a-3 (4). Accordingly, we conclude that a constitutional violation exists that deprived the defendant of a fair trial.[19]

As to *Golding*'s fourth prong, we further conclude, and the state does not argue to the contrary, that the error is not harmless. Although we acknowledge that the court sentenced the defendant to serve a concurrent sentence for the lesser and greater offenses, we recognize that the conviction of both of the separate offenses, in their own right, impermissibly harm the defendant. See *State* v. *Nelson*, 118 Conn. App. 831, 855, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010). Thus, pursuant to *State* v. *Polanco*, 308 Conn. 242, 255, 61 A.3d 1084 (2013), we remand the case to the trial court with direction to vacate the conviction of the lesser included offense of assault in the first degree.[20]

The judgment is reversed only as to the conviction of assault in the first degree and the case is remanded with direction to vacate that conviction; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of the crimes of sexual assault and risk of injury to a child, we

decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] Kim testified that the defendant was incarcerated in connection with an incident of domestic violence against her.

[3] See General Statutes § 17a-101 (b) (1).

[4] At trial, Kim testified that the defendant had spanked N, causing the bruises that Kelly observed.

[5] Kim first noticed the bruises after she had left N alone with the defendant on June 22, 2013. The defendant told Kim that N had fallen and hit her head on the baseboard heater in his bedroom.

[6] This text appears to reference the injury that N sustained on June 22, 2013. See footnote 5 of this opinion.

[7] Kim saw that the bruising to the right side of N's head was different from the bruising that the child had sustained from purportedly hitting her head on the baseboard heater several days earlier.

[8] An autopsy conducted on June 28, 2013, by Susan Williams, an associate medical examiner, concluded that N died from fatal child abuse syndrome with blunt abdominal trauma.

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] The court imposed a mandatory sentence of ten years of incarceration on count one, the assault in the first degree conviction, to be served concurrently with count two. The court imposed a mandatory sentence of twenty-five years of incarceration on count two, the aggravated sexual assault of a minor conviction. With respect to count three, the risk of injury conviction, the court imposed a ten year sentence to be served concurrently with the sentence on count two. On count four, the manslaughter in the first degree conviction, the court imposed a sentence of five years of incarceration followed by fifteen years of special parole, to be served consecutively to the sentence on count two.

[11] General Statutes § 53a-70c (a) provides in relevant part: "A person is guilty of aggravated sexual assault of a minor when such person commits a violation of subdivision (2) of subsection (a) of section 53-21 or section 53a-70, 53a-70a, 53a-71, 53a-86, 53a-87 or 53a-196a and the victim of such offense is under thirteen years of age, and . . . (3) such person used violence to commit such offense against the victim . . . ."

General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[12] Vaginal and perineal swabs taken from N's body were negative for the presence of semen. Swabs taken from N's anal area were positive for proteins that are present in semen; however, the swabs were negative for the presence of spermatozoa and male DNA.

[13] See *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[14] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[15] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[16] During closing argument the state argued: "As to count one, Your Honor, the state has proven beyond a reasonable doubt each and every element of the offense, and he is guilty. When the defendant inflicted blunt force trauma to [N's] head, that was reckless conduct and that was conduct in and of itself that created a risk of [N's] death. The head trauma did not cause her death, per se, but it did create the risk of her death, and it was reckless. And this repetitive trauma to her abdomen was also reckless and that indeed did, not only cause, but create a risk in [N's] death as well.

* * *

"And, finally, Your Honor, as to count four, manslaughter in the first degree, we have proven each and every element beyond a reasonable doubt.

"When the defendant engaged in repetitive trauma to [N's] abdomen, he engaged in reckless conduct. And that conduct also created a grave risk of

death and ultimately caused her death. Dr. Williams testified that she ruled the cause of death was fatal child abuse syndrome with blunt trauma, and she called it a homicide, and she indicated that there were hemorrhagic and necrotic injuries and that she bled to death, which caused her death."

[17] "The state agrees with the defendant that the conduct alleged in count one and count four arose out of the same act or transaction because the state, in closing argument, relied on the injuries to N's abdomen to support both the assault and manslaughter convictions."

[18] General Statutes § 53a-3 (4) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."

[19] We note that "[t]he *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history. . . . Where there is no clear indication of a contrary legislative intent, however, the *Blockburger* presumption controls." (Internal quotation marks omitted.) *State* v. *Vasquez*, 66 Conn. App. 118, 125, 783 A.2d 1183, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001). The state cites no authority, nor are we aware of any, that supports the conclusion that the legislature intended to permit multiple punishments for a single transaction involving the offenses charged in this case. We defer, therefore, to the *Blockburger* presumption that the defendant's conviction of assault in the first degree, as charged, is a lesser included offense of manslaughter in the first degree.

[20] In vacating the defendant's conviction of assault in the first degree, we note that the sentence imposed for this conviction was to run concurrent with the sentence imposed for the conviction of aggravated sexual assault of a minor. Accordingly, it is unnecessary to remand this case to the trial court for resentencing. See *State* v. *Graham S.*, 149 Conn. App. 334, 346, 87 A.3d 1182 ("we have held that when some of a defendant's convictions are reversed, and the trial court clearly intended that a nonreversed conviction control its sentencing scheme, remand for resentencing is not necessary where . . . vacating the accompanying sentences will not frustrate the trial court's intent" [internal quotation marks omitted]), cert. denied, 312 Conn. 912, 93 A.3d 595 (2014).