******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* JAMES JARMON
## (AC 42357)

Alvord, Prescott and Flynn, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of home invasion, burglary in the first degree, robbery in the first degree and stealing a firearm in connection with the theft of certain firearms from N's house, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his claim that the state presented insufficient evidence to prove beyond a reasonable doubt the operability of each of the stolen firearms, as the cumulative effect of the evidence, when construed in a light most favorable to sustaining the jury's verdict, supported the jury's ultimate conclusion that the state demonstrated operability beyond a reasonable doubt: the evidence presented supported an inference of operability because, from that evidence, the jury reasonably could have concluded that the guns were operable, as they were stored in N's bedroom in cases or bags with safety locks on and access was restricted to the bedroom, which evinced an awareness that the firearms were dangerous, and it was reasonable to infer that operable firearms would trigger such concern, and the fact that N's mother would not permit the firearms to be stored anywhere other than securely in the bedroom and that that ultimatum was assiduously followed by N further supported an inference that the firearms were operable; moreover, the jury reasonably could have inferred that N's storing of his handgun in a nightstand beside his bed where, while asleep, he might be most vulnerable permitted an inference that he possessed the handgun for security purposes, and the jury then could have inferred that such a handgun was operable; furthermore, given that, at the time the firearms were stolen, they had been in N's possession for no longer than one year and sixteen days from N's earliest purchase and that the only time the firearms left N's bedroom was to go to the training grounds, which the jury reasonably could have inferred was a place to fire the guns, the guns were fired at least once during the time N possessed them, and the jury reasonably could have inferred that the firearms were operable upon purchase and remained operable when they were stolen.

(*One judge dissenting*)

2. The defendant could not prevail on his claim that the trial court erroneously admitted into evidence a letter that he had written to his mother while incarcerated, which was intercepted by a correction officer and forwarded to law enforcement: the defendant's claim that the trial court erred in determining that the correction officer followed a certain regulation when he turned over the correspondence to law enforcement was never distinctly raised at trial and, therefore, was unpreserved and not reviewable on appeal; moreover, the defendant did not prove that he had an objectively reasonable expectation of privacy such that his fourth amendment rights were violated, and, thus, there was no constitutional violation under the third prong of *State* v. *Golding* (213 Conn. 233); furthermore, the department regulation at issue was not void for vagueness as applied to the defendant, as the language of the regulation gave notice to the defendant that he could have his mail reviewed if doing so was deemed in the interest of security, order or rehabilitation by prison officials, and a prison official reasonably could have determined that the letter contained plans for criminal activity, such as witness tampering.

3. The defendant's claim that his conviction of home invasion and burglary violated his constitutional protection against double jeopardy was unavailing; the defendant failed to show that the two charges arose out of the same act or transaction, as the evidence allowed the defendant's crimes to be separated into parts, each of which constituted a completed offense.

Argued September 16, 2019—officially released January 14, 2020

*Procedural History*

Substitute information charging the defendant with crimes of home invasion, burglary in the first degree and robbery in the first degree, and with three counts of the crime of stealing a firearm, brought to the Superior Court in the judicial district of Waterbury and tried to jury before *Cremins, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Don E. Therkildsen, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, James Jarmon, appeals from the judgment of conviction of home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and three counts of stealing a firearm in violation of General Statutes § 53a-212 (a). On appeal, the defendant claims that (1) the state presented insufficient evidence to prove beyond a reasonable doubt the operability of each firearm the defendant stole, (2) the trial court erroneously admitted into evidence a letter written by the then incarcerated defendant that was intercepted by a correction officer, and (3) the defendant's conviction of home invasion and burglary in the first degree violated his constitutional protection against double jeopardy. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 12, 2015, Nathaniel Garris attended a birthday party for his nephew. At the party, Garris spoke on the phone with the defendant, whom Garris knew all his life and whom, though they were unrelated, Garris referred to as his "cousin." It had been about four or five months since Garris and the defendant had seen each other last, and the defendant wanted to "chill" with Garris to "catch up." The two met up that same day and went to Niko Infanti's house.[1]

At Niko's home, the defendant and Garris began playing video games in Niko's bedroom. At one point, the defendant observed a case in Niko's bedroom and asked if it contained a guitar, to which Garris responded "no, that's a gun."[2] At another point, Garris retrieved a knife out of Niko's bedside nightstand, which also contained Niko's handgun. Thereafter, the defendant participated in a few phone calls; the defendant left Niko's bedroom to pick up each phone call.

While the defendant and Garris were in Niko's bedroom, Kade was in the kitchen using her laptop. An individual unknown to Kade, later identified by the police as Brett Vaughn, "peeked his head in the back door" and asked for the defendant. Kade went to Niko's bedroom, told the defendant that there was someone waiting for him at the back door and returned to the kitchen. Once Kade arrived back in the kitchen, Vaughn, who had entered the house, grabbed her and put a gun to the back of her head. Meanwhile, back in Niko's bedroom, Garris became upset with the defendant after hearing Kade's message because he perceived that the defendant had invited someone over without asking him. Garris walked out to the kitchen to see who was there waiting for the defendant and found Vaughn standing behind a seated Kade with a gun pressed to her head. Garris, who only knew Vaughn "from passing,"

pleaded with him to point the gun at him rather than Kade, to which Vaughn responded "[you're] beat, don't die over something stupid." Vaughn then yelled "hurry up." Christina heard the disturbance from her own bedroom, came out to see its cause and, after observing the scene, repeatedly told Vaughn to leave. The defendant had remained in Niko's bedroom after Garris walked to the kitchen and while this tumultuous scene unfolded. He then emerged from Niko's bedroom with all four of Niko's firearms in bags. The defendant and Vaughn proceeded to leave out the back door, with Vaughn being the first one out. As the defendant was exiting the back door, Garris jumped on his back and was able to retrieve one of the bags, which contained Niko's shotgun.

The defendant was arrested on May 20, 2015, and charged in a substitute information on September 29, 2016. On September 30, 2016, a jury returned guilty verdicts against the defendant for home invasion, burglary in the first degree, robbery in the first degree, and three counts of stealing a firearm. On March 2, 2017, the court imposed on the defendant a total effective sentence of ten years of incarceration, followed by six years of special parole.[3] This appeal followed.

I

The defendant first claims there was insufficient evidence to support his conviction of the three counts of stealing a firearm because no evidence was admitted that demonstrated the operability of the stolen firearms. The defendant argues that "[o]perability, especially when the guns were never recovered and there is no evidence the gun was fired during the incident, has never been proven with such scant evidence." The state responds that "it was reasonable to infer that [the guns] were operable at the time that they were purchased" and that "[t]he jury could reasonably have inferred that the firearms remained operable approximately one year later when they were stolen by the defendant." We agree with the state.

We first set forth our standard of review. "In reviewing a jury verdict that is challenged on the ground of insufficient evidence, we employ a two part analysis. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . . The evidence must be construed in a light most favorable to sustaining the jury's verdict. . . . In reaching its verdict, the jury can draw reasonable and logical inferences from the facts proven and from other inferences drawn from the evidence pre-

sented. Our review is a fact based inquiry limited to a determination of whether the jury's inferences drawn were so unreasonable as to be unjustifiable." (Citations omitted; internal quotation marks omitted.) *State* v. *Bradley*, 39 Conn. App. 82, 90–91, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996).

Section 53a-212 (a) states that "[a] person is guilty of stealing a firearm when, with intent to deprive another person of such other person's firearm or to appropriate the firearm to such person or a third party, such person wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3." A "[f]irearm" is defined as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded *from which a shot may be discharged* . . . ." (Emphasis added.) General Statutes § 53a-3 (19). "Operability of the [firearm is] an essential element of the [crime] charged under General Statutes [§ 53a-212 (a)] . . . ." *State* v. *Carpenter*, 19 Conn. App. 48, 59, 562 A.2d 35, cert. denied, 213 Conn. 804, 567 A.2d 834 (1989). "The operability of a firearm can be proven either by circumstantial or direct evidence." *State* v. *Bradley*, supra, 39 Conn. App. 91.

As in *Bradley*, the issue before us is "whether the jury could have drawn reasonable inferences from the evidence to enable it to conclude, beyond a reasonable doubt, that the gun that the defendant possessed was operable." Id. The state points to the following evidence in the record that would support a conclusion that the firearms were operable. Niko lawfully bought his three stolen firearms from sportsmen retailers between March 27, 2014, and June 27, 2014.[4] Niko kept his guns confined to his bedroom. The three long guns were in the open space of his bedroom, but kept inside cases or bags and fastened with some form of safety lock. The handgun was kept in Niko's nightstand "in a locked case." With the exception of Garris, who slept in Niko's bedroom, Niko "[v]ery rarely let anybody in that room." If Niko was not so diligent about keeping his firearms in his bedroom, his mother would have put him "out of the house in like point six seconds." As such, the firearms left Niko's bedroom only when he took them to the "training grounds."

The defendant argues that this evidence is inadequate to prove the operability of the firearms beyond a reasonable doubt. He contends that his case is distinguishable from a number of this court's past decisions in which operability was at issue. See *State* v. *Edwards*, 100 Conn. App. 565, 575–76, 918 A.2d 1008 (testimony of witnesses describing gun used in robberies, which matched gun found in defendant's flight path and ballistics testing of which showed it was same gun fired in separate shooting deemed sufficient for operability inference), cert. denied, 282 Conn. 928, 929, 926 A.2d 666, 667 (2007); *State* v. *Miles*, 97 Conn. App. 236, 241,

903 A.2d 675 (2006) (operability proven where victim saw defendant with small silver handgun that matched gun introduced into evidence, defendant was only person victim saw with gun, and victim identified defendant as shooter in photographic lineup and at trial on cross-examination); *State* v. *Rogers*, 50 Conn. App. 467, 469, 475, 718 A.2d 985 (front seat passenger displaying gun and fire coming from passenger seat area sufficient evidence of operability), cert. denied, 247 Conn. 942, 723 A.2d 319 (1998); *State* v. *Hopes*, 26 Conn. App. 367, 376–77, 602 A.2d 23 (testimony that defendant pointed gun at witnesses inside restaurant, within one minute followed witnesses outside restaurant, then witnesses heard gunfire and "felt something pass close by their heads" sufficient to prove operability of defendant's gun), cert. denied, 221 Conn. 915, 603 A.2d 405 (1992); see also *State* v. *Beavers*, 99 Conn. App. 183, 190, 912 A.2d 1105 (police test of gun sufficient evidence of operability), cert. denied, 281 Conn. 925, 918 A.2d 276 (2007); *State* v. *Bradley*, supra, 39 Conn. App. 91 (same); *State* v. *Zayas*, 3 Conn. App. 289, 299, 489 A.2d 380 (same), cert. denied, 195 Conn. 803, 491 A.2d 1104 (1985). The defendant's reliance on these cases to demonstrate what evidence is minimally necessary to prove operability is unpersuasive. Each of these cases presents evidence sufficient to prove operability, but a compilation of these cases do not define a minimum standard of necessary evidence to establish operability.

"[T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 518, 782 A.2d 658 (2001).

The evidence presented in this case supports an inference of operability because, from that evidence, the jury reasonably could have concluded that the guns were operable. Niko stored all of his firearms in his bedroom in cases or bags and with safety locks on. He restricted access to his bedroom. Niko's precautions evince an awareness that his firearms were dangerous. It is reasonable to infer that operable firearms would trigger such concern. Although a person might take similar steps to secure *inoperable* firearms, that possibility does little to negate the likelihood of reasonable jurors relying on their common sense understanding of firearms to infer that Niko's security measures reflected

that his firearms were operable. See id., 519 ("an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference" [internal quotation marks omitted]).

The defendant argues that regardless of the guns' operability, "it is reasonable to infer that a mother would not want a very young child or teenagers to have access to two rifles and a handgun." The defendant again ignores the most obvious explanation for the position of Niko's mother: a gun is most dangerous if operable. The defendant also implies, incorrectly, that the jury's refusal to draw an inference more favorable to the defendant makes the inference they did draw an unreasonable one. That is not so. See id., 518–19 ("[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis" [internal quotation marks omitted]). The fact that Niko's mother would not permit his firearms being stored anywhere other than securely in his bedroom, and that Niko assiduously followed his mother's ultimatum, further supports an inference that these guns were operable.

Additionally, Niko kept his handgun in a nightstand beside his bed. From this, the jury reasonably could have inferred that Niko's storing of his handgun in close proximity to his bed where, while asleep, he might be most vulnerable, permits an inference that he possessed the handgun for security purposes. The jury then could have further inferred that such a handgun was operable, or else it would be of little security value. Niko also kept this handgun in a locked case. As with the long guns, this permits an inference that Niko took this safety measure because the handgun was an operable firearm.

Lastly, Niko bought the three stolen firearms from retailers, with the earliest purchase made on March 27, 2014. The defendant stole the guns on April 12, 2015. Accordingly, when stolen, Niko's firearms were in his possession for no longer than one year and sixteen days. Kade testified that the only time Niko's firearms left his bedroom was to go to the "training grounds." Thus, the guns were taken to the "training grounds," which the jury reasonably could have inferred was a place to fire the guns, and that the guns were therefore fired at least once during the year and sixteen days[5] that Niko possessed them. Therefore, the jury reasonably could have inferred that the firearms were operable upon purchase and, because Niko did take the guns to a firing range during the limited duration of his ownership, remained operable when they were stolen.

The defendant cites to *State* v. *Perez*, 146 Conn. App. 844, 79 A.3d 149 (2013), cert. denied, 311 Conn. 909, 83 A.3d 1163 (2014), for the proposition that "a firearm left in storage without the proper care and cleaning can become inoperable." In *Perez*, a firearm became inoperable in the sixteen months between a successful

dry fire[6] of the firearm by law enforcement and subsequent testing because the gun became "gummed up by a residue in the . . . cylinder pin." (Internal quotation marks omitted.) Id., 847. The gun still was found to be operable because "the responding officer dry fired the gun and observed that its firing mechanism was functional shortly after the defendant possessed it . . . ." Id., 850. We fail to see how *Perez* informs our analysis in this case. *Perez* is a factually distinguishable case, and the evidence used to prove operability in that case is not required to prove operability in this case.

Our review of the record does not persuade us that the jury made unreasonable inferences regarding operability. To the contrary, the cumulative effect of the evidence in this case, when construed in a light most favorable to sustaining the jury's verdict, supports the jury's ultimate conclusion that the state has demonstrated operability beyond a reasonable doubt. See *State* v. *Bradley*, supra, 39 Conn. App. 90.[7]

II

The defendant next claims that the trial court erroneously admitted into evidence a letter the defendant wrote to his mother while incarcerated, which was intercepted by a correction officer and forwarded to law enforcement. The defendant argues that (1) the "court erred in determining that the correction officer followed the [department of correction (department) regulation[8]] when he turned over the correspondence" (footnote added); (2) "[t]he defendant maintained a reasonable expectation of privacy in his letter written to [his] mother," making its seizure a violation of the fourth amendment to the United States constitution; and (3) the department regulation "regarding inmate correspondence is void for vagueness as applied to this case."

The following additional facts are relevant to this issue. At trial, on September 29, 2016, the state offered into evidence a letter written by the then incarcerated defendant to his mother, which was intercepted by a correction officer and forwarded to law enforcement. After reviewing the contents of the letter, the court was prepared to admit the letter as an admission by the defendant. Conn. Code. Evid. § 8-3 (1) (A). Defense counsel objected to the letter's admission, stating that "when someone is incarcerated in a Connecticut facility, they are stripped of most of their expectation of privacy, but not all" and that "I think [the department] has put a limit on themselves that not just anybody can open a letter at their own discretion." Defense counsel requested the opportunity to voir dire a department representative "to see whether or not this opening of a letter came at the direction of a unit manager by a person in writing." The court permitted the voir dire of Correction Officer Evan Charter. After the voir dire concluded, defense counsel argued that the department

"did not follow the directive. Just because someone is in a category of high bond or pretrial doesn't necessarily . . . further substantial interest[s] of security, order or rehabilitation." The court asked defense counsel, "[w]ould you agree [that the regulation] was followed in this situation?" Defense counsel responded, "I would agree [Officer Charter] followed [the regulation]." The court "allow[ed] the letter to come in," and defense counsel stated, "I still stand by my objection . . . ." Additional facts will be set forth as necessary.

A

We begin with the defendant's claim that "[t]he trial court erred in determining that [Officer Charter] followed the [regulation] when he turned over the correspondence" to law enforcement. We conclude that the defendant never distinctly raised this claim at trial. It is therefore unpreserved and unreviewable on appeal.

The regulation governs the review of an inmate's outgoing general correspondence.[9] The regulation authorizes the "Unit Administrator" to select "specific inmate(s)" or inmates "on a random basis" to have their outgoing general mail reviewed if there is "reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation." The regulation further directs the "Unit Administrator" to designate in writing the "person(s)" who will review inmate mail. Under the regulation, those designated "person(s)" are given the authority to restrict, confiscate, return to the inmate, retain for further investigation, refer for disciplinary proceedings or forward to law enforcement officials any outgoing general correspondence that "contain[s] or concern[s]" a list of nine prohibited inmate actions. See Regs., Conn. State Agencies § 18-81-31 (a).

The focus of the defendant's voir dire of Officer Charter was on the decision to review the defendant's mail in the first instance, not on whether the mail could be provided to law enforcement. Defense counsel's initial objection to the court was that the department "put a limit on themselves that not just anybody can open a letter at their own discretion." Defense counsel requested the voir dire "to see whether or not this opening of a letter came at the direction of a unit manager by a person in writing." During voir dire, Officer Charter testified that he did not make the initial decision to review the defendant's general outgoing mail.[10] After voir dire, defense counsel argued that the regulation was not followed because reviewing the mail of a high bond or pretrial inmate "doesn't necessarily . . . further substantial interest[s] of security, order or rehabilitation." The voir dire did not explore Officer Charter's decision to forward the defendant's letter to law enforcement after a review of the letter.

Now, on appeal, the defendant claims that "[t]he trial

court erred in determining that [Officer Charter] followed the [regulation] when he turned over the correspondence." This claim, challenging Officer Charter's authority and decision to turn the defendant's letter over to law enforcement pursuant to the regulation, is a claim that was not distinctly raised at trial. As such, it is unpreserved and not reviewable. See Practice Book § 60-5; *State* v. *Morquecho*, 138 Conn. App. 841, 851, 54 A.3d 609, cert. denied, 307 Conn. 941, 56 A.3d 948 (2012).

In his reply brief, the defendant claimed for the first time that "[t]here is no doubt that [the] trial counsel was objecting on the basis that the correction officer was not authorized to read the defendant's outgoing letter solely on the basis that he was being held on a high bond." We decline to review this claim because "arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Myers*, 178 Conn. App. 102, 106, 174 A.3d 197 (2017).

B

The defendant's second claim with respect to the letter is that his fourth amendment rights were violated. The defendant did not distinctly raise this claim at trial[11] but seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015).[12] For the purposes of this decision we assume that the record is adequate, and we agree that the claim is of a constitutional magnitude. There is, however, no constitutional violation. See *State* v. *Martin*, 77 Conn. App. 778, 800, 825 A.2d 835 ("[t]he defendant has failed to cite any authority, nor have we found any, for the proposition that a pretrial detainee has a reasonable expectation of privacy in his telephone calls and mail *after* being informed that his calls and mail would be monitored" [emphasis in original]), cert. denied, 266 Conn. 906, 832 A.2d 73 (2003). During the voir dire, Officer Charter testified that *all* inmates are notified that their calls and mail may be monitored upon entry into a facility.[13] The defendant presented no evidence that he lacked such notice. Accordingly, the defendant did not prove that he had an objectively reasonable expectation of privacy. See *State* v. *Houghtaling*, 326 Conn. 330, 341, 163 A.3d 563 (2017) ("[t]he burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant" [internal quotation marks omitted]), cert. denied, U.S. , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018).[14] The defendant's claim fails under *Golding's* third prong.

C

The defendant's third claim with respect to the letter is that the regulation is void for vagueness as applied to this case.[15] This claim also was unpreserved but because the record is adequate and vagueness claims implicate the due process clause of the federal constitu-

tion, we review it under *Golding. State* v. *Thomas W.*, 115 Conn. App. 467, 471–72, 974 A.2d 19 (2009), aff'd, 301 Conn. 724, 22 A.3d 1242 (2011). The defendant, however, cannot establish a constitutional violation.

The defendant argues that "[he] had inadequate notice that his letter would be used against him and he was the victim of arbitrary and discriminatory enforcement." The state argues that the regulation "carries no penal consequences" and, even if the regulation does implicate due process, the defendant had "fair notice that his outgoing general correspondence may be subject to review, and that such correspondence may be forwarded to law enforcement officials . . . if . . . it contained a plan for criminal activity . . . ." In his reply brief, the defendant responds that "[t]he state, without citing to authority, simply dismisses this claim by contending that since [the regulation is nonpenal] . . . there is no implication of the due process clause." (Internal quotation marks omitted.)

"[T]he United States Supreme Court has stated that [t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment. . . . [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." (Internal quotation marks omitted.) *Thalheim* v. *Greenwich*, 256 Conn. 628, 641, 775 A.2d 947 (2001). "The constitutional requirement of definiteness applies more strictly to penal laws than to statutes that exact civil penalties." *State* v. *Rivera*, 30 Conn. App. 224, 229, 619 A.2d 1146, cert. denied, 225 Conn. 913, 623 A.2d 1024 (1993). "The words 'penal' and 'penalty,' in their strict and primary sense, denote a punishment, whether corporal or pecuniary, imposed and enforced by the State for a crime or offense against its laws." *Plumb* v. *Griffin*, 74 Conn. 132, 134, 50 A. 1 (1901); see also 82 C.J.S., Statutes § 529 (2019) ("[i]n common use, however, the term 'penal statutes' has been enlarged to include all statutes which define an offense and prescribe a punishment"). "[C]ivil statutes . . . may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes . . . ." (Internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 323, 732 A.2d 144 (1999).

The defendant fails to demonstrate that this regulation is penal and should receive closer scrutiny. See *State* v. *Rivera*, supra, 30 Conn. App. 229. Regardless, the defendant's claim fails even under the more exacting standard of review that applies to penal laws. "To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] . . . must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement."

(Internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 759, 988 A.2d 188 (2010). The defendant cannot carry his burden.

The regulation states in relevant part that "[a]ll outgoing general correspondence shall be subject to being read at the direction of the Unit Administrator . . . in writing . . . for either a specific inmate(s) or on a random basis if the Commissioner or Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation." Regs., Conn. State Agencies § 18-81-31 (a). This language gave notice to the defendant that he could have his mail reviewed if doing so was deemed in the interest of security, order or rehabilitation by prison officials. The regulation was followed when the defendant, as a high bond and pretrial detainee, was identified in writing as an inmate to have his mail reviewed. See *Washington* v. *Meachum*, 238 Conn. 692, 726, 680 A.2d 262 (1996) ("the United States Supreme Court [has] recognized the expertise of prison officials and that the judiciary is 'ill equipped to deal with the increasingly urgent problems of prison administration,' and [has] emphasized that courts should afford 'deference to the appropriate prison authorities' "). The regulation further provides that outgoing mail could be "forwarded to law enforcement officials, if such review discloses correspondence or materials which contain or concern . . . Plans for criminal activity." Regs., Conn. State Agencies § 18-81-31 (a) (4). This language provided sufficient notice to the defendant that his letters could be forwarded to law enforcement if they contained plans for criminal activity. In the defendant's letter to his mother, he wrote "mom find out how the [victims] feel about the [whole] situation. [S]ee if they [are] still in CT or [if] they moved to AZ try to talk to them tell them how sorry I am tell them if [anything] Britt's [girl] is willing to give them [$5000] after we come home. See if they want to take the stand. I need you to do this now." A prison official reasonably could have determined that the letter contained plans for criminal activity, such as witness tampering. See General Statutes § 53a-151. The regulation is not void for vagueness as applied to the defendant.[16]

### III

The defendant's final claim is that the charges of home invasion[17] and burglary[18] are the same offense, making his conviction of both offenses a violation of his constitutional protection against double jeopardy. Thus, the defendant argues that his conviction of burglary in the first degree must be vacated.[19] We disagree.

"Double Jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if

both conditions are met." (Internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d. 811 (2013). "At step one, it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified by the bill of particulars. . . . If it is determined that the charges arise out of the same act or transaction, then the court proceeds to step two, where it must be determined whether the charged crimes are the same offense. . . . At this second step, we [t]raditionally . . . have applied the *Blockburger*[20] test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both states in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In applying the *Blockburger* test, we look only to the information and bill of particulars—as opposed to the evidence presented at trial—to determine what constitutes a lesser included offense of the offense charged. . . . Because double jeopardy attaches only if both steps are satisfied . . . a determination that the offenses did not stem from the same act or transaction renders analysis under the second step unnecessary." (Citations omitted; footnote added; internal quotation marks omitted) *State* v. *Porter*, 328 Conn. 648, 662, 182 A.3d 625 (2018).

The defendant was charged in a substitute information with home invasion in violation of § 53a-100aa (a) (1)[21] and burglary in the first degree in violation of § 53a-101 (a) (3)[22] as both the principal and as an accessory under General Statutes § 53a-8 (a). The state's theory of the case was that the home invasion occurred based on "[Vaughn] go[ing] over there and bring[ing] a gun with him. Then he enters in that house to commit a crime to help the larceny. He puts a gun to Kade's head," and the burglary occurred when the defendant remained in the house at night with the intent to steal Niko's firearms.

Under step one, "[t]he same transaction . . . may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which constitutes a completed offense. . . . [T]he test is not whether the *criminal intent* is one and the same and inspiring the whole transaction, but whether *separate acts* have been committed with the requisite criminal intent and are such as are made punishable by the [statute]. . . . When determining whether two charges arose from the same act or transaction, our Supreme Court has asked whether a jury reasonably could have found a separate factual basis for each offense charged." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Bennett*, 187

Conn. App. 847, 853, 204 A.3d 49, cert. denied, 331 Conn. 924, 206 A.3d 765 (2019). In *Bennett*, the defendant was charged under the same subsections of the statues criminalizing home invasion and burglary in the first degree as the defendant in the present case. Id., 848. This court concluded in *Bennett* that the two crimes could be separated into parts. "[T]he burglary charge arose from the distinct and separate act of *entering* the dwelling at night with the intent to commit a larceny, while the home invasion charge arose from the separate act of *threatening the use of physical force* against [the victim] after the defendant and [the codefendant] entered the home and were committing the larceny." (Emphasis in original.) Id., 855; see also *State* v. *Schovanec*, 326 Conn. 310, 328–29, 163 A.3d 581 (2017).

In the present case, the evidence allows the defendant's crimes to be separated into parts. While the defendant and Garris were playing video games in Niko's bedroom, the defendant inquired as to what Niko's cases contained, and Garris responded that Niko's guns were stored in the cases. Later, the defendant took multiple phone calls, leaving Niko's bedroom for each one. After these phone calls, Vaughn, who was unknown to Kade and not well known to Garris, showed up at the back door of the house. Kade went to Niko's bedroom and told the defendant that someone was there to see him. This upset Garris because the defendant had not first asked Garris about Vaughn's coming over.

After both Kade and Garris left Niko's bedroom for the kitchen, the defendant remained alone in Niko's bedroom. Lastly, when Vaughn had a gun pressed to Kade's head and Garris was pleading with Vaughn to point the gun at him, Vaughn yelled "hurry up," which the jury reasonably could infer was directed at the defendant. On the basis of the foregoing, the jury reasonably could have concluded that the defendant formulated the intent to take Niko's firearms before Vaughn's arrival when he was in Niko's bedroom, learned of the guns' existence and participated in numerous phone calls that he took outside of Garris' presence. In other words, the defendant had remained in Niko's house unlawfully with the intent to commit a larceny prior to Vaughn's arrival. The jury also reasonably could have determined that the home invasion occurred when Kade returned back to the kitchen and Vaughn grabbed her and pressed a handgun to the back of her head. That act, to which the jury reasonably could have convicted the defendant as being an accessory, constituted the separate act of threatening the immediate use of physical force element for robbery, which is an element of the offense of home invasion. See General Statutes § 53a-133.[23]

Because the defendant failed to show that the two charges arose out of the same act or transaction, there

is no need to proceed to step two and perform a *Blockburger* analysis. See *State* v. *Porter,* supra, 328 Conn. 663 n.11. The defendant's double jeopardy argument fails.

The judgment is affirmed.

In this opinion PRESCOTT, J., concurred.

[1] On April 12, 2015, Garris was residing at Niko's house and sleeping in the same bedroom as Niko, whom he described as his "best friend, like a brother." Also living at the house then was Niko's mother, Michelle Infanti; Niko's siblings, Christina Infanti, Jesse Infanti, Michael Collins and Kade Collins; and Christina's eight year old daughter, all of whom "treated [Garris] just like family." Niko, his mother and Jesse were all absent from the house that evening as they were looking at houses in Arizona. For ease of reference, Niko, Christina and Kade will be referred to by their first names throughout this opinion.

[2] The record reflects that Niko lawfully had possessed four firearms: a twelve gauge, Maverick Arms shotgun; a .22 caliber, Henry Repeating Rifle Company rifle; a seven millimeter, Savage rifle; and a nine millimeter, Heckler & Koch handgun.

[3] The defendant received ten years of incarceration followed by six years of special parole on his home invasion conviction, a concurrent ten years of incarceration on his burglary in the first degree conviction, another concurrent ten years of incarceration on his robbery in the first degree conviction, and concurrent two year sentences of incarceration on his conviction of each charge of stealing a firearm.

[4] Niko's Henry Repeating Rifle Company rifle was purchased on March 27, 2014, his Heckler & Koch handgun was purchased on May 12, 2014, and his Savage rifle was purchased on June 27, 2014.

[5] Two of the firearms were owned for slightly less than a year and sixteen days, but for ease of discussion we use the longer timespan.

[6] "The Officer removed the ammunition from the loaded gun and . . . squeeze[ed] the trigger and activat[ed] the hammer . . . ." *State* v. *Perez,* supra, 146 Conn. App. 847.

[7] The defendant also argues that "[t]he state presented no expert evidence that would have permitted the jury to properly infer from the circumstantial evidence that the state presented that the missing guns had been operable at the time they were taken beyond a reasonable doubt." The defendant cites to no authority, and we are aware of none, that supports the position that expert evidence is necessary to prove operability of a firearm under the facts of this case.

[8] The regulation at issue is § 18-81-31 of the Regulations of Connecticut State Agencies. See footnote 8 of this opinion. In his brief, the defendant interchangeably references the regulation and the department administrative directive 10.7, § 4 (F) (1) (directive). The directive is, in part, authorized by the regulation, and the language relevant to the issue of inmate mail review is substantially similar in both the regulation and directive. Hereinafter, we will refer only to the regulation.

[9] Section 18-81-31 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) Review, Inspection and Rejection. All outgoing general correspondence shall be subject to being read at the direction of the Unit Administrator, by person(s) designated in writing by such Administrator, for either a specific inmate(s) or on a random basis if the Commissioner or Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation. Outgoing general correspondence may be restricted, confiscated, returned to the inmate, retained for further investigation, referred for disciplinary proceedings or forwarded to law enforcement officials, if such review discloses correspondence or materials which contain or concern: (1) The transport of contraband in or out of the facility. (2) Plans to escape. (3) Plans for activities in violation of facility or departmental rules. (4) Plans for criminal activity. (5) Violations of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies or unit rules. (6) Information which if communicated would create a clear and present danger of violence and physical harm to a human being. (7) Letters or materials written in code. (8) Mail which attempts to forward unauthorized correspondence for another inmate. (9) Threat to the safety or security of staff, other inmates or the public. The initial decision to take action provided for in this Subsection except to read, which shall be at the discretion of

the Unit Administrator, shall be made by the designee of the Unit Administrator. Such designee shall not be the same person who made the initial mailroom review. . . .”

[10] Section 18-81-31 (a) of the Regulations of Connecticut State Agencies provides in relevant part that “[a]ll outgoing general correspondence shall be subject to being read at the direction of the Unit Administrator, *by person(s) designated in writing by such Administrator* . . . .” (Emphasis added.) The following testimony was elicited from Officer Charter on examination by the prosecutor and defense counsel:

“[The Prosecutor]: And why was [the defendant’s] letter reviewed?

“[Officer Charter]: He was a member of the A-1 High Bond Unit. . . .

“[The Prosecutor]: Was he also in any kind of status?

“[Officer Charter]: Unsentenced pretrial.

“[The Prosecutor]: Does that affect when you review something?

“[Officer Charter]: Generally we do review all outgoing for the pretrial unit, A1 Unit, the High Bond Unit.” . . .

“[Defense Counsel]: So according to the [regulation], it says that all outgoing general correspondence shall be subject to being read at the direction of the unit manager. Who is the unit manager?

“[Officer Charter]: That would be the warden. . . .

“[Defense Counsel]: And it appears to say the unit manager, in your case the warden, can designate in writing someone to open the mail, correct?

“[Officer Charter]: Correct.

“[Defense Counsel]: Is that you?

“[Officer Charter]: Yes.

“[Defense Counsel]: Was that done in writing?

“[Officer Charter]: Yes. . . .”

[11] Defense counsel began his objection to the letter’s admission into evidence by stating that “when someone is incarcerated in a Connecticut facility, they are stripped of most of their expectation of privacy, but not all.” After defense counsel requested, and the court granted, a voir dire of Officer Charter, the prosecutor stated: “[I]t’s now turning into a miniature suppression hearing which I have no objection to.” We disagree with the defendant, who argues that these statements adequately raised his fourth amendment claim. Defense counsel never sufficiently put the court on notice that the purpose of the voir dire was to mount a fourth amendment claim. See *State* v. *Faison*, 112 Conn. App. 373, 380, 962 A.2d 860 (trial counsel’s “general exhortation[s]” were inadequate to preserve claims presented on appeal), cert. denied, 291 Conn. 903, 967 A.2d 507 (2009).

[12] Under *Golding*, “a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.” (Footnote omitted; emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015).

The state argues that the defendant’s failure to file a pretrial motion to suppress the letter is a waiver of this claim pursuant to Practice Book §§ 41-2, 41-3 and 41-4. In light of our conclusion that the defendant’s claim does not rise to the level of a constitutional violation, we do not determine whether the defendant’s claim is waived.

[13] Officer Charter testified as follows:

“[The Prosecutor]: When an inmate goes in a correctional facility, are they informed their mail is going to be monitored?

“[Officer Charter]: Yes.

“[The Prosecutor]: How’s that done?

“[Officer Charter]: There’s an acknowledgement form they sign.

“[The Prosecutor]: Everybody does that?

“[Officer Charter]: Absolutely. It’s part of the admission package.”

[14] The defendant analogizes his case to *United States* v. *Cohen*, 796 F.2d 20, 24 (2d Cir. 1986), cert. denied, 479 U.S. 854, 107 S. Ct. 189, 93 L. Ed. 2d 122 (1986), cert. denied sub nom. 479 U.S. 1055, 107 S. Ct. 932, 93 L. Ed. 2d 982 (1987) to argue that his fourth amendment rights were violated. In *Cohen*, an inmate’s fourth amendment rights were found to be violated by a search of his cell, but the case is distinguishable because that search was ordered by a prosecutor to obtain information for a superseding indictment. Id. In the defendant’s case, the review of his mail was authorized by prison

officials for reasons of security, order or rehabilitation. See part II C of this opinion; cf. *United States* v. *Cohen*, supra, 24 ("[i]n this case it is plain that no institutional need is being served").

[15] The defendant argues the regulation's vagueness violates his state and federal due process rights. The defendant did not, however, provide a separate analysis under the Connecticut constitution, so we limit our discussion to the federal constitution. *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995).

[16] The defendant also argued that his state and federal rights to protected speech, to a familial relationship and to prepare and present a defense were violated. The defendant's briefing does not make it clear whether these claims, particularly the first amendment claim to free speech, are intended to stand on their own or are encompassed within the broader void for vagueness argument. If they are intended as independent claims, they are inadequately briefed and we are not required to review them. See *State* v. *Monahan*, 125 Conn. App. 113, 122, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011). If the defendant's first amendment argument is part of his vagueness claim, it makes no difference to our conclusion because that claim fails even under the standard of review most favorable to the defendant.

[17] The defendant was charged with home invasion in violation of General Statutes § 53a-100aa (a) (1), which provides in relevant part: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense: (1) Acting either alone or with one or more persons, such person or another participant in the crime commits or attempts to commit a felony against the person of another person other than a participant in the crime who is actually present in such dwelling . . . ."

[18] The defendant was charged with burglary in the first degree in violation of Section 53a-101 (a) (3), which provides in relevant part: "A person is guilty of burglary in the first degree when . . . (3) such person enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

[19] The defendant's double jeopardy claim was not raised at trial, but the parties agree that it is reviewable under *Golding*. See *State* v. *Bumgarner-Ramos*, 187 Conn. App. 725, 744, 203 A.3d 619, cert. denied, 331 Conn. 910, 203 A.3d 570 (2019).

[20] v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[21] Count one of the substitute information states that the defendant committed home invasion "in that on or about April 12, 2015, at approximately 9:23 p.m., at or near 78 Eastwood Avenue, Waterbury, Connecticut, [the defendant], did enter or remain unlawfully in a dwelling, while a person other than a participant in the crime was actually present in such dwelling, with intent to commit a crime therein, and in the course of committing the offense: acting with another person, such person and another participant in the crime committed a felony (to wit: robbery) against the person of another person other than a participant in the crime who is actually present in such dwelling."

[22] Count two of the substitute information states that the defendant committed burglary in the first degree "in that on or about April 12, 2015, at approximately 9:23 p.m., at or near 78 Eastwood Avenue, Waterbury, Connecticut, [the defendant], did enter and remain unlawfully in a dwelling at night with intent to commit a crime therein."

[23] The defendant's argument that he "had not been remaining unlawfully in [Niko's home], he had been an invited guest" and that "[t]he gathering of the guns, the unlawful remaining all occurred at the same time when Vaughn arrived with a gun" is unavailing. There was sufficient evidence for the jury to reasonably conclude that the defendant was remaining unlawfully in the house with the intent to commit larceny prior to Vaughn's arrival, which allows for the home invasion and burglary in the first degree crimes to be separated into parts.

The defendant's argument is unsupported by *State* v. *Holmes*, 182 Conn. App. 124, 127, 189 A.3d 151, cert. denied, 330 Conn. 913, 193 A.3d 1210 (2018). The defendant cited to *Holmes*' procedural history, which recited a trial court decision to vacate the conviction of burglary in the first degree as a lesser included offense of home invasion. Id. There was no claim made in *Holmes* to challenge the propriety of that decision and, as such, this court neither discussed the factual background for the home invasion and burglary charges nor discussed whether they could reasonably be separated into

parts. Therefore, *Holmes* is unhelpful to the defendant's argument.

———————————————————